UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LAW OFFICES OF OLIVER ZHOU,

                Plaintiff,

         - against -

CITIBANK N.A., and
PNC BANK, N.A.,

                Defendants.

**OPINION AND ORDER**

15 Civ. 5266 (ER)

---

Ramos, D.J.:

      The Law Offices of Oliver Zhou ("Plaintiff") alleges various claims of negligence, breach of contract, misrepresentation, fraudulent concealment, and aiding and abetting against Citibank, N.A. ("Citibank") and PNC Bank, N.A. ("PNC Bank") (collectively "Defendants"), for failing to prevent Plaintiff's losses from what appears to have been a counterfeit check scheme. Before the Court is Defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants' motion is GRANTED.

**I.    BACKGROUND**

      The following facts, accepted as true for purposes of the instant motion, are based on the allegations in the Complaint. Complaint ("Compl.") (Doc. 1, Ex. A).

      Plaintiff and its principal, Oliver Zhou ("Zhou"),[1] maintained an "IOLA Attorney Trust Account" (the "Account") at Citibank. Compl. ¶ 3. On June 17, 2013, Plaintiff received a cashier's check from a new purported client that displayed PNC Bank's logo and the routing

---

[1] The Complaint refers at one point to "Plaintiff, Oliver Zhou, Esq., pro se." Compl. at 1. The case was formally filed, however, by the Law Offices of Oliver Zhou, a limited liability company organized under New York law. *See* ECF Dkt. No. 15-cv-5266; Compl. ¶ 2. According to the docket, Zhou is representing his own law firm, but he is not himself an individual plaintiff. This case, therefore, does not formally involve a *pro se* plaintiff.

number 071921891 (the "Check"), in the amount of $297,500. *Id.* at ¶ 3 & Ex. 1. The next day, Zhou deposited the Check into the Account by presenting it to a Citibank teller. *Id.* at ¶¶ 3–4. The teller reviewed the Check, accepted it without using any "counterfeit device" to determine the Check's validity or checking whether the routing number was right, and provided Zhou with a bank receipt stamped with notice of the funds' availability. *Id.* at ¶¶ 4, 8. That notice was dated June 18, 2013, and stated that $297,750 was "Available Today." *Id.* at Ex. 2.

On June 19, 2013, after asking John Huang ("Huang"), a Citibank clerk, whether the Check "was valid and equivalent to cash," Zhou was told that "the money was available since June 18, 2013" and that "the fund was good." *Id.* at ¶ 12. Thereafter on the same day, at the direction of his purported client, Zhou requested a wire transfer of $287,450 from the Account to a third party's account in Japan (the "Transfer"). *Id.* at ¶ 12 & Ex. 4. On June 20, 2013, PNC Bank returned the Check to Citibank as "Altered/Fictitious," and Citibank then "reversed the provisional credit" in the Account in the amount of $297,512. *Id.* at Exs. 4, 5.[2]

On June 24, 2013, one of Plaintiff's other clients notified Zhou that a check Zhou had issued to him had been dishonored due to insufficient funds in the Account. *Id.* at ¶ 16. Zhou then immediately contacted Citibank and was informed that PNC Bank had determined that the Check was "a forged or counterfeit instrument" and would not be honored. *Id.* at ¶ 17. Zhou requested that the Transfer be cancelled, and while Citibank's representatives told Zhou they would report back, Plaintiff has not been further contacted by Citibank, and from the pleadings it appears plain that the Transfer was never successfully recalled. *Id.* at ¶¶ 18–19 & Exs. 4, 5. On June 26, 2013, Plaintiff received written notice from Citibank that the Check returned as "bounced" because it was "Altered/Fictitious." *Id.* at ¶ 20.

---

[2] The charge back was for the original Check amount of $297,500 plus a $12.00 service fee. Compl., Ex. 5.

2

In sum, Plaintiff appears to have been the victim of an unfortunately commonplace scheme targeting attorneys, in which a fake new client provides a counterfeit check for the attorney to deposit and then requests an emergency wire of funds from the attorney's bank account before the check bounces. The victim attorney is then both subject to his bank's right to charge back the funds from the check when it is eventually dishonored, and unable to reverse the wire of funds to the fake client.

On June 10, 2015, Plaintiff timely commenced this action by filing a Complaint in the Supreme Court of New York, County of New York. *See* Compl. On July 7, 2015, PNC Bank removed the case to this Court with consent from co-defendant Citibank, on grounds of diversity jurisdiction. *See* Defendants' Notice of Removal (Doc. 1). Defendants filed the instant motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on September 18, 2015. (Docs. 25, 27).

## II.   LEGAL STANDARD

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter…to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

3

for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III. DISCUSSION

### A. Claims Against Citibank

Plaintiff asserts seven claims against Citibank, falling into four categories: breach of contract, negligence, misrepresentation, and concealment. None of these claims is supported by sufficient allegations to survive Citibank's motion to dismiss.

#### 1. Breach of Contract

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (citations omitted). In its first cause of action, Plaintiff claims that Citibank breached when it failed "to provide its professional service" in a "good faith, ordinary and reasonable manner," because it failed to discover fraudulent checks. Compl. ¶ 29.

Because Plaintiff failed to attach or make reference to any specific contract in the Complaint, Citibank attached to its motion three documents that it represents to be the operative contracts between it and Plaintiff: the Citibank Signature Card (the "Signature Card"), the Citibank Client Manual (the "Client Manual"), and the Marketplace Addendum (the "Addendum"). *See* Declaration of John Haslam (Doc. 29), Ex. A (Signature Card), Ex. B (Client Manual), Ex. C (Addendum). Plaintiff denies that these are the documents underlying his breach-of-contract claim. *See* Memorandum of Law in Opposition ("Pl.'s Opp'n") (Doc. 33) at 8 ("[T]his so-called Client Manual and its subsequent amendments unilaterally made by Defendants have no legal bearing upon the contractual relationship between plaintiff and

4

defendant Citibank."). But Plaintiff does not specify any other contract between the parties. Plaintiff's breach-of-contract claim is thus ripe for dismissal because the Complaint fails to allege or describe a specific contract, alluding only in the most general terms to a "contractual relationship" between Plaintiff and Citibank.[3]

Even if Plaintiff had agreed with Citibank's representation that the Client Manual and Addendum constituted the contractual agreement between them (and hence enabled the Court to rely on these extrinsic documents for purposes of this motion), those contracts do not appear to obligate Citibank to detect or investigate fraudulent checks. Moreover, as Citibank details in its briefing, those documents contain clear notice provisions describing the process that Citibank undertakes when it accepts a deposited check, including its process for making the check amount provisionally "available" to the depositor,[4] and the bank's right to "charge back" the check amount from the depositor's account in the event the check goes unpaid. *See* Memorandum of Law of Citibank, N.A. (Doc. 30) at 6–7.

Plaintiff's breach-of-contract claim against Citibank is dismissed without prejudice.[5]

---

[3] Plaintiff appears to invoke UCC sections 4-201 and 4-202, as well as the law of bailments, to define what Plaintiff describes as the "expansive contractual relationship" between it and Citibank. *See* Pl.'s Opp'n at 9–10. The three breaches specified in the opposition brief—failure to provide due notice, failure to detect the check that was facially defective, and failure "to exercise ordinary and reasonable care"—are identical to Plaintiff's negligence claims, which are also governed by the duties provided under the UCC. The Court will thus discuss those theories of liability in the next section addressing negligence, as it cannot do so under the auspices of a breach-of-contract claim where no specific contract has been identified. Plaintiff does not provide any authority or persuasive arguments for why the common law of bailment is applicable in this case.

[4] "Pursuant to the Expedited Funds Availability Act (12 U.S.C. § 4001 *et seq.*), banks are required to make funds from a deposited check available for the depositor's withdrawal within certain short time periods." *Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*, 958 N.E.2d 77, 82 (N.Y. 2011) (citing 12 U.S.C. § 4002 (b)(1)). "The purpose of the '[a]ct is to provide faster availability of deposited funds.'" *Id.* (quoting *Haas v. Commerce Bank*, 497 F. Supp. 2d 563, 565 (S.D.N.Y. 2007)). As will be discussed, the availability of funds "is provisional and the collecting bank has the right to charge back the amount if the check is dishonored or the bank fails to receive a settlement for the check." *Id.* (citing New York Uniform Commercial Code § 4-212). This expedited-but-provisional availability of funds, combined with the lag time it takes for checks to be finally settled or returned as dishonored, is what makes possible the type of fraudulent scheme that Plaintiff apparently fell victim to here.

[5] The Court notes the following language from the Client Manual that would appear to apply to Plaintiff's case, and urges Plaintiff to address the implications of this provision in an amended complaint, should one be filed: "When

*2. Negligence*

Plaintiff asserts four negligence claims against Citibank: (1) Citibank was negligent because its tellers did not identify the defective routing number on the face of the Check upon Plaintiff's presentment (Compl. ¶ 32); (2) Citibank was negligent in failing to use an "anti-counterfeit device to detect the fake cashier's check" (*id.* at ¶ 35); (3) Citibank failed to "notify the plaintiff promptly" that the same-day "availability" of funds meant only that Plaintiff's account received a provisional credit "subject to collection and revocation" (*id.* at ¶ 39);[6] and (4) Citibank negligently "failed to investigate the matter" after the "discovery" that Plaintiff deposited a counterfeit check, "thereby failing to assist recovery or to mitigate the amount of the plaintiff's loss" (*id.* at ¶¶ 63–64).

The New York Uniform Commercial Code (the "UCC") prescribes extra-contractual duties to banks in New York. Specifically, the UCC "prescribes the duties the various banks owe to a depositor." *Greenberg, Trager, & Herbst, LLP v. HSBC Bank USA*, 958 N.E.2d 77, 82 (N.Y. 2011); *see also Dixon, Laukitis, & Downing, P.C. v. Busey Bank*, 993 N.E.2d 580, 585, 587 (Ill. App. Ct. 2013) ("Provisions such as section 4–202 of the UCC displace common law negligence principles….Timely compliance with the section 4-202 responsibilities constitutes ordinary care and is not negligent as a matter of law.") (citation omitted); Pl.'s Opp'n at 11.

The UCC defines the roles of, and duties imposed on, each bank throughout the deposit and collection process. Under the UCC's terms, Citibank initially acted as a "depositary bank" and later as a "collecting bank" during the events alleged. A depositary bank is defined in the

---

you open an account, you agree to abide by the rules and regulation governing that account. While some of the information, rules and regulations are contained in this manual, others can be found in the account agreements and other documents we give you at the time you open particular accounts." Client Manual at 5.

[6] Although Plaintiff's Complaint does not expressly style this as a negligence claim, it does not provide any other basis for liability—contractual, statutory, or otherwise. The Court thus construes the cause of action as sounding in negligence under the UCC's "ordinary care" standard. *See* UCC § 4-202.

UCC as "the first bank to which an item is transferred for collection," which was Citibank's role upon Plaintiff's depositing of the Check. UCC § 4-105(a). A collecting bank is defined as "any bank handling the item for collection except the payor bank," § 4-105(d), which became Citibank's role upon initiation of its efforts to collect a final settlement from PNC. PNC served as the "payor bank" as defined by section 4-105(b), throughout the transaction. *See infra* III.B.

Citibank's obligations as a collecting bank are governed by UCC Article 4. In relevant part, section 4-201 states that, "[u]nless a contrary intent clearly appears and prior to the time that a settlement given by a collecting bank for an item is or becomes final…the bank is an agent or sub-agent of the owner of the item and any settlement given for the item is provisional." § 4-201(1).[7] Under section 4-202, a collecting bank owes a depositor a duty of "ordinary care" when "presenting a check or sending a check for presentment, sending a notice of dishonor or nonpayment or returning a check, and settling the check when the colleting bank receives final payment from the payor bank." *Greenberg, Trager*, 958 N.E.2d at 82 (citing § 4-202(1)).[8] "The UCC does not define 'ordinary care,' but it should be read as to have its normal tort meaning." *Id.* at 85. "[A] collecting bank has until midnight of the next banking day…to take the [prescribed] actions when receiving a check, notice of dishonor, or final settlement of the check." *Id.* at 82 (citing § 4-202(2)). Furthermore, the UCC expressly permits collecting banks to make "provisional settlements" upon deposit, *i.e.*, credit a depositor's account with the check amount, and then "revoke the settlement" and "charge back the amount of any credit given" in the event the collecting bank does not receive final settlement from the payor bank, which is what occurred

---

[7] One "practical result[]" stemming from this provision codifying the "agency status" of the collecting bank is that "risk of loss continues in the owner of the item rather than the agent bank." UCC § 4-201, cmt. 4 (citing § 4-212, the UCC provision allowing collecting back to charge back provisional credit upon rejection of item by payor bank).

[8] The UCC defines the term "presentment" as "a demand for acceptance or payment made upon the maker, acceptor, drawee or other payor by or on behalf of the holder." § 3-504.

in this case. *See* § 4-212(1); *see also Greenberg, Trager*, 958 N.E.2d at 81 n.6 ("UCC 4–212(1) states that a collecting bank retains its right to charge back to a customer's account any provisional credit it has given if, upon an item's dishonor, the bank 'returns the item or sends notification of the facts' by the midnight deadline.").

Plaintiff here does not adequately allege that Citibank breached its UCC-prescribed duty of ordinary care. Nor does Plaintiff provide any authority for the proposition that ordinary care requires a collecting bank to identify false routing numbers, use fraudulent-check detection devices, investigate the source of counterfeit checks, or provide explicit notices upon deposit that explain the bank's policies on provisional credits and the bank's right to charge back if a check goes unpaid.[9] Were collecting banks required to ensure the validity of all checks at the time of deposit, as Plaintiff's negligence theory essentially demands, there would be no need for the UCC provision allowing for provisional settlement and charge back. *Cf. JPMorgan Chase Bank, N.A. v. Freyberg*, No. 14 Civ. 6851 (RMB), 2016 WL 2605209, at *5 (S.D.N.Y. Mar. 17, 2016) (collecting New York cases affirming collecting bank's right to charge back provisionally credited funds after fraudulent check is rejected by payor bank); UCC § 4-212, cmt. 1 ("Under current bank practice, in a major portion of cases banks make provisional settlement for items when they are first received and then await subsequent determination of whether the item will be finally paid….Statistically, this practice of settling provisionally first and then awaiting final

---

[9] Although not part of the Court's analysis here, and because there is a possibility that Plaintiff may seek to file an amended complaint, the Court notes that Plaintiff may have been on notice already: There are clauses within the Client Manual and Addendum describing Citibank's policy of provisional settlements and charge backs. *See* Client Manual at 27 ("The Bank's policy on availability of funds from checks that you deposit will not affect your obligation to repay the Bank for any check that you deposit that is not paid, nor will it affect the Bank's right to charge back your account or to obtain reimbursement for any check that is not finally paid for any reason."); Addendum at 37 (same). The UCC includes a similar provision. *See* § 4-212(1).

payment is justified because more than ninety-nine per cent of such cash items are finally paid….").

Indeed, the New York Court of Appeals, in a practically identical case to the one here, explicitly held that under the UCC "any inherent risk [] *remains with the depositor* and not the collecting bank" until final settlement by the payor bank, because a depositor-attorney is "in the best position to guard against the risk of a counterfeit check by knowing its client." *Greenberg, Trager*, 958 N.E.2d at 84, 86 (emphasis added) (citation and internal quotation marks omitted).[10] "'A collecting bank acts as the agent of its customer, and until such time as the collecting bank receives final payment, the risk of loss continues in the customer, the owner of the item.'" *Freyberg*, 2016 WL 2605209, at *4 (quoting *Hanna v. First Nat'l Bank of Rochester*, 661 N.E.2d 683, 689 (N.Y. 1995)). Plaintiff repeatedly attempts to place the risk of loss on Citibank, the collecting bank here. *See, e.g.*, Pl.'s Opp'n at 13–14 ("Above all, it is plaintiff's position that banks, rather than bank's customers, are in a much better and superior position to detect and prevent the fraudulent banking activities since banks are in the forefront of their normal and regular business operation dealing with these issues on a daily basis."). But that approach has no support under New York's UCC statute. *Freyberg*, 2016 WL 2605209, at *5 ("The UCC is clear

---

[10] The facts of *Greenberg, Trager* are practically identical to the facts in this case. The *Greenberg, Trager* plaintiff was also a law firm, which received an unsolicited email from a purported client seeking legal representation. The fake client agreed to pay the plaintiff a $10,000 retainer, and informed plaintiff that a customer of the client's would be sending the plaintiff a check for $197,750, which the customer supposedly owed to the client. The client instructed plaintiff to receive and deposit the check into the plaintiff's attorney trust account, and then wire $187,750 from that account to the client's account in Hong Kong, holding on to the $10,000 retainer. Plaintiff contacted the collecting bank three days after deposit to ask whether the check had "cleared," was told that "the funds were available," and wired the $187,750 to the fake client that same day. Days later, the payor bank informed the collecting bank that the check had been dishonored and was being returned as counterfeit. The collecting bank then charged back the $197,750 credit it had made provisionally available to the plaintiff, and the plaintiff was unable to cancel the wire to the Hong Kong account. The plaintiff then sued both the collecting bank and the payor bank on grounds of negligence and negligent misrepresentation. *See Greenberg, Trager*, 958 N.E.2d at 78–81. The New York Court of Appeals affirmed dismissal of the plaintiff's claims on summary judgment. *Id.* at 87.

that, until there is a final settlement of the check, the risk of loss lies with the depositor.") (citations omitted).[11]

Plaintiff's negligence claims, based on the failure to identify the check as fraudulent or to give specific notice of Citibank's provisional-settlement and charge-back policies at the time of deposit,[12] are all dismissed with prejudice, because even alleging additional facts establishing this conduct would not constitute a breach of ordinary care as a matter of law. *See Greenberg, Trager*, 958 N.E.2d at 85–86; *Dixon, Laukitis*, 993 N.E.2d at 586–87 (relying on *Greenberg, Trager* to dismiss negligence claim based on duty of ordinary care under UCC § 4-202, where plaintiff alleged that collecting bank failed in "investigating the circumstances regarding the check, recognizing it as counterfeit, advising [plaintiff] not to withdraw funds until final settlement, and notifying [plaintiff] at the earliest time that it was dishonored").[13]

---

[11] Plaintiff attempts to distinguish *Greenberg, Trager*, and a similar Second Circuit case, *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793 (2d Cir. 2011), by arguing that those cases did not involve a counterfeit check "defective on its face," and that the courts in those cases did not explicitly analyze whether a depository or collecting bank owed explicit notice of its provisional-credit and charge-back policies upon deposit. Pl.'s Opp'n at 14. Neither of these minor distinctions, even if accurate, would compel the Court to disregard these two controlling cases or the UCC's statutory allocation of the risk of loss in these situations.

[12] Plaintiff also attempts to frame its notice claim as sounding in principles of due process. *See* Pl.'s Opp'n at 16 (citing, *inter alia*, *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306 (1950)). Since there is no allegation that any defendant here was a state actor, this claim too must fail. *See, e.g.*, *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151 (2d Cir. 2004) ("The right to due process established by the Fourteenth Amendment applies only to government entities, and an attempt to vindicate that right…can be lodged only against a government entity.").

[13] Plaintiff's reliance on two older cases applying New York law is also unavailing. *See* Pl.'s Opp'n at 12 (citing *Northpark Nat'l Bank v. Bankers Trust Co.*, 572 F. Supp. 524 (S.D.N.Y. 1983); *Broadway Nat'l Bank v. Barton-Russell Corp.*, 154 Misc. 2d 181 (N.Y. Sup. Ct. 1992)). These cases involve unreasonable delays and alleged failures to provide notice by collecting banks *after* nonpayment or "red flags" of potential fraud. *See Northpark Nat'l*, 572 F. Supp. at 531–33; *Broadway Nat'l*, 154 Misc. 2d at 192; *see also* Reply Mem. of Law of Citibank N.A. (Doc. 35) at 2 (noting that the Complaint does not seek relief on grounds of delayed notice "for good reason," given that exhibit attached to Complaint shows that Plaintiff's account was debited on June 20, 2013 because the Check was "returned unpaid"). These two cases do not support Plaintiff's proposition that the UCC's standard of ordinary care requires collecting banks to undertake the variety of *preemptive* obligations that Plaintiff seeks to impose here. *Broadway Nat'l* is particularly inapposite here, as it involved the duty of a collecting bank vis-à-vis a depository bank to timely process merchant credit card slips in a manner that allowed for reasonable and timely notice to the depositor bank of possible fraudulent slips. *See* 154 Misc. 2d at 183–86, 192. Indeed, tellingly, neither case was even mentioned by the New York Court of Appeals in *Greenberg, Trager*.

*3. Misrepresentation*

Plaintiff's fifth cause of action alleges that Citibank "misrepresented material fact[s] regarding the date of fund availability, which really is the date of credit availability subject to collection," and that Plaintiff detrimentally relied on that representation by wiring out funds prior to final settlement.  Compl. ¶ 43.  Based on factual allegations elsewhere in the Complaint, this claim appears to be premised on two representations:  (1) the "stamp" on the receipt Zhou received the day he deposited the Check, stating that the deposited funds were "Available Today," *id.* at ¶ 8 & Ex. 2, and (2) the statement by Huang, the Citibank clerk, that that "the money was available since June 18, 2013" and "the fund was good," allegedly made to Zhou on June 19, 2013, the day after the deposit, *id.* at ¶ 12.

A plaintiff must show "reasonable reliance" on a misrepresentation to prevail in an action for negligent misrepresentation under New York law.  *See Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014).  But in cases substantially similar to this one, "New York courts have found that alleged oral statements such as 'the check had cleared,' or 'the funds are available' to be 'ambiguous remark[s] that may have been intended to mean only that the amount of the check was available…,'" and have thus concluded that a plaintiff's reliance on such statements when effectuating a wire is unreasonable as a matter of law.  *Freyberg*, 2016 WL 2605209, at *10 (quoting *Greenberg, Trager*, 958 N.E.2d at 85).  For example, in *Greenberg, Trager*, the plaintiff was told by a bank clerk that its checks had "cleared" and that funds "were available," but the New York Court of Appeals rejected the plaintiff's claim for negligent misrepresentation, holding that reliance on such statements was unreasonable as a matter of law.  958 N.E.2d at 80, 85.

11

The same reasoning applies to the two purported misrepresentations in this case, both of which were functionally equivalent to, and just as ambiguous as, statements that New York courts have previously addressed. *See Greenberg, Trager*, 958 N.E.2d at 85; *see also Fischer & Mandell*, 632 F.3d at 799 (construing statement on Citibank website that funds were "available" as meaning "only that the account balance could be withdrawn from the account and not that the balance represented collected funds"); *Freyberg*, 2016 WL 2605209, at *10; *Margot J. Garant, Inc. v. Suffolk Cty. Nat'l Bank*, 46 Misc. 3d 1218(A), 17 N.Y.S.3d 383, 2015 WL 669452, at *8 (N.Y. Sup. Ct. 2015) (citing the "overwhelming weight of authority" that has "declined to unsettle the statutory allocation of risk of loss found in UCC article 4" and "rejected claims of reliance on statements by banks, either express or implied, that funds were 'available' or had 'cleared,'" because such terms "are not found in the UCC," "their meaning is ambiguous," and "reliance thereon by the plaintiffs was unreasonable as a matter of law") (citations omitted).[14] Plaintiff's misrepresentation claim—whether based on a negligence theory or a fraud theory—is dismissed with prejudice. *See Freyberg*, 2016 WL 2605209, at *11–12 ("Reasonable reliance is an essential element of both fraud and negligent misrepresentation….[Depositor's] reliance on [collecting bank's] statement as assurance that final settlement of the Counterfeit Check had occurred was, under the circumstances here, unreasonable as a matter of law.") (citing *Greenberg, Trager*, 958 N.E.2d at 85; *Margot J. Garant*, 2015 WL 669452, at *7). Amended allegations describing the same representations by Citibank would be futile, given that reliance

---

[14] Plaintiff argues that his allegations of Citibank's misrepresentations should not be dismissed without the benefit of discovery, citing *JP Morgan Chase Bank, N.A. v. Cohen*, 26 Misc. 3d 1215(A), 907 N.Y.S.2d 101, 2009 WL 5612345 (N.Y. Sup. Ct. 2009). Pl.'s Opp'n at 15. But *Cohen* merely refused to foreclose the possibility of a negligent misrepresentation claim where there was an express statement from a bank that *final settlement had already occurred*. *Cohen*, 2009 WL 5612345, at *7 (citing *Chase v. Morgan Guarantee Trust Co.*, 590 F. Supp. 1137, 1139 n.3 (S.D.N.Y. 1984)). There is no such allegation here. *Cohen* also predated the New York Court of Appeal's holding in *Greenberg, Trager*, which definitively ruled on the type of statements alleged here. *Cf. Greenberg, Trager*, 958 N.E.2d at 88 (Pigott, J., dissenting) (citing *Cohen* in dissent from majority's holding).

on such representations is unreasonable as a matter of law. *Cf. Stokes v. Lusker*, No. 08 Civ. 3667 (CM), 2009 WL 612336, at *6 (S.D.N.Y. Mar. 4, 2009) ("The dismissal is with prejudice because there is no way that the plaintiff could re-plead to demonstrate reasonable reliance on the defendants' alleged misrepresentations and omissions."), *aff'd*, 425 F. App'x 18 (2d Cir. 2011).[15]

### 4. Fraudulent Concealment

Plaintiff's final claim against Citibank alleges that Citibank "had knowledge of multiple instances of forged or counterfeit instruments, yet intentionally concealed said information necessary to protect the public in order to maintain a positive corporate image and for other purposes." Compl. ¶ 65. Although the Complaint does not specify a specific theory of liability, and Plaintiff's brief in opposition does not even refer to this claim, the allegations most closely resemble those of fraudulent concealment. To state a claim for fraudulent concealment under New York law, a plaintiff must allege that there was "(1) a duty to disclose material facts; (2) knowledge of material facts by a party bound to make such disclosures; (3) failure to discharge a duty to disclose; (4) scienter; (5) reliance; and (6) damages." *De Sole v. Knoedler Gallery, LLC*,

---

[15] To the extent Plaintiff intended to allege negligent misrepresentation, the claim fails for an independent reason: the lack of a special relationship. Among other elements, a claim for negligent misrepresentation under New York law requires proof of "the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff." *Freyberg*, 2016 WL 2605209, at *11 (citation omitted). No such special relationship is alleged here, because there is no automatic fiduciary or special relationship based on a garden variety borrower-lender relationship between a bank and its depositor. *See id.*; *see also Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 158 (2d Cir. 1995) ("Generally, banking relationships are not viewed as special relationships giving rise to a heightened duty of care.") (citations omitted); *Jurgensen v. Felix Storch, Inc.*, No. 12 Civ. 1201 (KBF), 2012 WL 2354247, at *9–10 (S.D.N.Y. June 14, 2012) (dismissing negligent misrepresentation claim with prejudice for inability to plead special relationship).

Furthermore, in the section discussing misrepresentation, Plaintiff's brief makes a passing reference to the Expedited Funds Availability Act ("EFAA"), 12 U.S.C. § 4001 *et seq.* Pl.'s Opp'n at 14. Reference to the EFAA, however, does not save Plaintiff's misrepresentation claim from dismissal. "Courts have uniformly held that the EFAA does not make banks liable for their customers' checks….The language of the statute is clear and creates no exception for cases in which the bank makes inaccurate assurances or outright misrepresentations regarding the account." *Freyberg*, 2016 WL 2605209, at *12 (citations and internal quotation marks omitted).

No. 12 Civ. 2313 (PGG), 2015 WL 5773847, at *15 (Sept. 30, 2015) (citation and internal quotation marks omitted); *see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 582 (2d Cir. 2005).

Fraudulent concealment claims must meet the pleading standards set out in Rule 9(b) of the Federal Rules of Civil Procedure. *See Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009) ("A claim of fraudulent concealment must be pled with particularity, in accordance with the heightened pleading standards of Fed. R. Civ. P. 9(b).") (citation omitted). To satisfy Rule 9(b), Plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "At the pleading stage, under Rule 9(b), a fraud plaintiff may establish a 'strong inference' of scienter, among other ways, 'by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006)).

The Complaint here falls well short of the Rule 9(b) pleading standard. First, the Complaint does not allege any facts to support an inference that Citibank had a duty to disclose knowledge of past instances of forgery to Plaintiff. *Cf. Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) ("New York recognizes a duty to disclose by a party to a business transaction in three situations: first, where the party has made a partial or ambiguous statement…; second, when the parties stand in a fiduciary or confidential relationship with each other…; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.") (citations and internal quotation marks omitted). Second, Plaintiff does not come close to alleging with particularity the "prior instances of unauthorized signatures" or Plaintiff's knowledge thereof,

merely stating in a conclusory fashion the existence of an "epidemic of forged and counterfeit PNC bank instruments." Compl. ¶¶ 22, 25. Third, apart from a passing reference to Citibank's incentive "to maintain a positive corporate image," *id.* at ¶ 65, the allegations of scienter are generic and conclusory, and do not give rise to the "strong inference" required under Rule 9(b).

Complaints dismissed under Rule 9(b) are "almost always" dismissed with leave to amend, particularly when a plaintiff has not had a chance to replead with particularity. *See City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Co.*, No. 07 Civ. 9921 (PKC), 2010 WL 309009, at *2 (S.D.N.Y. Jan. 22, 2010) (quoting *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)). The Complaint's ninth cause of action is thus dismissed without prejudice.

### B. Claims Against PNC Bank

Plaintiff asserts two claims against PNC Bank. The first alleges that "PNC's failure to implement effective mechanisms to monitor the whereabouts and status of its instruments or criminal acts of its employees" meant that "PNC enabled, aided and ab[e]tted, contributed to, or caused the usage by a third party of a missing or stolen PNC Cashier's Check which the plaintiff deposited into its IOLA account at Citi." Compl. ¶¶ 47–48. The second alleges that "PNC by its negligence caused or substantially contributed to the making of an unauthorized signature on its forged PNC Cashier's Check," because PNC Bank had previously become aware of "several instances" of "missing, stolen or forged" checks, "accepted these incidents as normal risks during the course of doing its business," and "failed to adopt any reasonable and effective procedures for protecting the plaintiff and the public" from such forgeries. *See id.* at ¶¶ 52–61. This second claim, in addition to negligence, arguably sounds in fraudulent concealment, as well. *See id.* at ¶ 60 ("But for defendant PNC's negligence and *intention to conceal* the information that is necessary to protect its customers, holders in due course and the public, the plaintiff

suffered damages….") (emphasis added).   Regardless, neither claim survives PNC Bank's motion to dismiss.

To the extent it is not entirely duplicative of the more encompassing second claim against PNC Bank, the first claim appears to be for aiding and abetting.  *Compare id.* at ¶¶ 45–49, *with id.* at ¶¶ 50–61.  Under New York law, to state a claim for aiding and abetting, Plaintiff must "establish the existence of a violation by the primary wrongdoer, knowledge of this violation by the aider and abettor, and proof that the aider and abettor substantially assisted in the primary wrong."  *Renner v. Chase Manhattan Bank, N.A.*, 85 F. App'x 782, 784 (2d Cir. 2004) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983)).  "New York courts require that the alleged abettor have *actual* knowledge of the primary wrong."  *Id.* (citing *Wight v. Bankamerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000)).  "[U]nder New York law, a complaint adequately alleges the knowledge element of an aiding and abetting claim when it pleads not…constructive knowledge, but actual knowledge of the fraud as discerned from the surrounding circumstances."  *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (citation and internal quotation marks omitted).  "A failure to allege sufficient facts to support the inference that the alleged aider and abettor had actual knowledge of the fraudulent scheme warrants dismissal of the aiding and abetting claim at the pleading stage."  *Id.* (citations omitted).

The Complaint here does not contain allegations sufficient to sustain a claim of aiding and abetting because Plaintiff does not allege any facts suggesting that PNC Bank knew the Check in this case was counterfeit and being used for fraud.  At most, the Complaint alleges that PNC Bank knew of previous instances of counterfeit and forged checks using the same or similar routing numbers and signatures.  Compl. ¶¶ 21–27.  This falls well short of alleging that PNC Bank *actually knew* that the fraud *in this case* was taking place.  *Cf. Lerner*, 459 F.3d at 292–93

(dismissing claim for aiding and abetting fraud where "alleged facts do not give rise to the 'strong inference,' required by Federal Rule of Civil Procedure 9(b), of actual knowledge of [] outright looting of client funds."); *In re Agape Litig.*, 773 F. Supp. 2d 298, 312–13 (E.D.N.Y. 2011) (dismissing aiding and abetting claim where allegations did not create inference that defendant "had actual knowledge of the underlying fraudulent scheme").

Furthermore, despite arguments specifically challenging the aiding-and-abetting claim in PNC Bank's moving brief,[16] Plaintiff does not discuss nor even refer to aiding and abetting in its opposition brief.  The Complaint's sixth cause of action is thus dismissed as abandoned.  *See, e.g.*, *Harborview Value Masterfund, L.P. v. Freeline Sports, Inc.*, No. 11 Civ. 1638 (CM), 2012 WL 612358, at *14 (S.D.N.Y. Feb. 23, 2012) ("'This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.'") (quoting *Upton v. County of Orange, NY*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004)).  Dismissal is with prejudice.  *See, e.g.*, *Marks v. Nat'l Commc'ns Ass'n, Inc.*, 72 F. Supp. 2d 322, 328 n.6 (S.D.N.Y. 1999) (dismissing abandoned claims with prejudice).

The second claim against PNC Bank primarily sounds in negligence.  Under the UCC, PNC Bank is considered a "payor bank."  *See* UCC § 4-105(b) (defining "payor bank" as "a bank by which an item is payable as drawn or accepted").  In a negligence action under New York law, "[t]he duty of a payor bank…to a non-customer depositor of a check is derived solely from UCC 4-301 and 4-302."  *Greenberg, Trager*, 958 N.E.2d at 83.  Section 4-301(1) states that:

> Where an authorized settlement for a demand item…received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment *if* before it has made final payment…and *before its midnight deadline* it (a) returns the item; *or* (b) sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return.

---

[16] Defendant PNC Bank N.A.'s Memorandum of Law (Doc. 26) at 11–13.

§ 4-301(1) (emphasis added). In other words, section 4-302(a) further explains that a payor bank will be liable for the amount of a check, even if counterfeit, if it "retains the [check] beyond midnight of the banking day of receipt without settling for it or…does not pay or return the [check] or send notice of dishonor until after its midnight deadline." § 4-302(a).[17] In sum, because Plaintiff was not a PNC Bank customer, "the only duty" that PNC Bank owed Plaintiff "was to pay the check, return the check or send a notice of dishonor of the check by midnight of the next banking day after receiving the check." *Greenberg, Trager*, 958 N.E.2d at 83.

Here, PNC appears to have timely returned the Check, *see* Compl., Ex. 5 (dating return of Check as June 20, 2013), and regardless, Plaintiff nowhere alleges that PNC Bank failed to do so. Accordingly, the negligence claim must be dismissed. *See Greenberg, Trager*, 958 N.E.2d at 83 (dismissing negligence claim against payor bank because plaintiff failed to allege that midnight deadline was broken); *Kevin Kerveng Tung, P.C. v. JP Morgan Chase & Co.*, 105 A.D.3d 709, 709–11 (N.Y. App. Div. 2013) (same, where plaintiff alleged only that payor bank was negligent for failing to safeguard its checks and failing to inform the public that counterfeit checks bearing payor bank's name were being circulated).[18] The negligence claim is dismissed

---

[17] The "midnight deadline" is defined as "midnight on [the bank's] next banking day following the banking day on which [the bank] receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." UCC § 4-104(h). Section 4-302(a) operates slightly differently when the payor bank is also the depository bank, but that is not the case here.

[18] In its brief, Plaintiff relies on two UCC provisions that are inapplicable here. *See* Pl.'s Opp'n at 18–19. The first is section 4-201, which applies to collecting banks, not payor banks. Plaintiff's reliance on section 4-201's reference to a bank's status as "agent" is also unavailing, because the New York Court of Appeals has already confirmed that the purpose of the term "agent" in that provision is to keep the risk of loss with the depositor, not the collecting bank. *See Greenberg, Trager*, 958 N.E.2d at 84–85. The second is section 3-406, which provides a defense for payor banks, not a duty owed to non-customers. *See Kevin Kerveng Tung, P.C. v. JP Morgan Chase & Co.*, 34 Misc. 3d 1209(A), 943 N.Y.S.2d 792, 2011 WL 6989895, at *4 (N.Y. Sup. Ct. 2011) ("Plaintiff's reliance on UCC 3-406 is also unavailing, this provides a negligence defense to a payor, under certain circumstances, where payment is made on an altered or forged instrument. Here, [payor bank] made no payment on the subject check.") (citations omitted), *aff'd*, 105 A.D.3d 709 (N.Y. App. Div. 2013); *see also Weafri Well Servs., Co. v. Fleet Bank, Nat'l Ass'n*, No. 98 Civ. 888 (JSM), 2000 WL 1472724, at *4 (S.D.N.Y. Sept. 29, 2000) ("Under U.C.C. § 3–406, a customer is precluded from asserting a forged signature against a bank where the bank establishes that (1) the customer's negligence substantially contributed to the making of the forgery, and (2) the bank itself acted in good faith and in accordance with reasonable commercial standards."). Plaintiff also argues, as a "matter of social

with prejudice, because an amended complaint could not state a claim premised on a duty PNC Bank owed to Plaintiff beyond the bank's duty to abide by the UCC's midnight deadline. *See Tzaras v. Evergreen Int'l Spot Trading, Inc.*, No. 01 Civ. 10726 (LAP), 2003 WL 470611, at *6 (S.D.N.Y. Feb. 25, 2003) (dismissing negligence claim without leave to amend because bank did not owe duty of care to non-customer).

To the extent the Complaint is read as asserting a fraudulent concealment claim, that claim is also dismissed with prejudice, because Plaintiff "failed to allege the existence of a fiduciary or confidential relationship between the parties," nor could an amended complaint do so as between a payor bank and a non-customer under these circumstances. *See Tung*, 105 A.D.3d at 711 (affirming dismissal of fraudulent concealment claim against payor bank).

## IV.  CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED and Plaintiff's Complaint is dismissed. As discussed, Plaintiff is granted leave to amend only the claims for breach of contract and fraudulent concealment against Citibank (first and ninth causes of action). Plaintiff's Amended Complaint should be filed, if at all, on or before **June 10, 2016**.

The Clerk of the Court is respectfully directed (1) to terminate the motions, Docs. 25, 27, and (2) to terminate PNC Bank as a party to the case.

It is SO ORDERED.

Dated:   May 17, 2016
         New York, New York

                                                        _____
                                                        Edgardo Ramos, U.S.D.J.

---

policy," that PNC Bank should be held to a "higher degree of responsibility" vis-à-vis the public at large. Pl.'s Opp'n at 18–19. But the two cases Plaintiff cites do not stand for such a proposition—they merely discuss situations in which "special relationships" give rise to extra-contractual, affirmative duties of care between parties to a contract. *See Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50 (N.Y. App. Div. 1988); *Charles v. Onondaga Cmty. Coll.*, 69 A.D.2d 144 (N.Y. App. Div. 1979). Plaintiff's policy argument is thus rejected, as well.

with prejudice, because an amended complaint could not state a claim premised on a duty PNC Bank owed to Plaintiff beyond the bank's duty to abide by the UCC's midnight deadline. *See Tzaras v. Evergreen Int'l Spot Trading, Inc.*, No. 01 Civ. 10726 (LAP), 2003 WL 470611, at *6 (S.D.N.Y. Feb. 25, 2003) (dismissing negligence claim without leave to amend because bank did not owe duty of care to non-customer).

To the extent the Complaint is read as asserting a fraudulent concealment claim, that claim is also dismissed with prejudice, because Plaintiff "failed to allege the existence of a fiduciary or confidential relationship between the parties," nor could an amended complaint do so as between a payor bank and a non-customer under these circumstances. *See Tung*, 105 A.D.3d at 711 (affirming dismissal of fraudulent concealment claim against payor bank).

## IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED and Plaintiff's Complaint is dismissed. As discussed, Plaintiff is granted leave to amend only the claims for breach of contract and fraudulent concealment against Citibank (first and ninth causes of action). Plaintiff's Amended Complaint should be filed, if at all, on or before **June 10, 2016**.

The Clerk of the Court is respectfully directed (1) to terminate the motions, Docs. 25, 27, and (2) to terminate PNC Bank as a party to the case.

It is SO ORDERED.

Dated:  May 17, 2016
        New York, New York

                                                    _____
                                                    Edgardo Ramos, U.S.D.J.

---

policy," that PNC Bank should be held to a "higher degree of responsibility" vis-à-vis the public at large. Pl.'s Opp'n at 18–19. But the two cases Plaintiff cites do not stand for such a proposition—they merely discuss situations in which "special relationships" give rise to extra-contractual, affirmative duties of care between parties to a contract. *See Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50 (N.Y. App. Div. 1988); *Charles v. Onondaga Cmty. Coll.*, 69 A.D.2d 144 (N.Y. App. Div. 1979). Plaintiff's policy argument is thus rejected, as well.